UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DMYTRYCK D. HENDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:12-cv-03069-SEM-TSH |
| | ) | |
| NEIL M. WILLIAMSON, JACK CAMPBELL, | ) | |
| ROBERT BEIERMAN, TAMMY POWELL, | ) | |
| TODD KRUEGER, GUY BOUVET, and | ) | |
| COUNTY OF SANGAMON, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, NEIL M. WILLIAMSON, JACK CAMPBELL, ROBERT BEIERMAN, TAMMY POWELL, TODD KRUEGER, GUY BOUVET and COUNTY OF SANGAMON, through their attorneys, HINSHAW & CULBERTSON LLP, pursuant to Fed. R. Civ. P. 56 and CD-IL LR 7.1(D), move for summary judgment and provide this memorandum in support thereof.

## I.     INTRODUCTION

Privacy is the thing most surely extinguished by a judgment committing someone to prison and guards are entitled to regulate every detail of an inmate's daily life.  Although Plaintiff claims he was subject to an unconstitutional strip search[1], the process he underwent was done to insure the security of the county jail.  That process was routinely administered in a manner that

---

[1] Plaintiff claims he was subject to a strip search. However, Plaintiff actually experienced what the County Defendants refer to as "Dressing Out." This is a visual search of an inmate before the inmate is placed in the general population of the jail. Hence, whenever Plaintiff refers to a strip search, he is actually referring to the dressing out procedure.  Throughout this memorandum, the County Defendants will use the terminology "Dressing Out" instead of strip search, unless otherwise indicated.

did not expose Plaintiff to unsanitary or egregious humiliating conditions, and Defendants are entitled to summary judgment.

## II.    DEFENDANTS' UNDISPUTED MATERIAL FACTS

### A. PARTIES.

1.    As the Court found in its opinion of September 13, 2012, all Defendants are sued in both their individual and official capacities. (Doc. #13).

2.    Defendant Neil Williamson is the Sheriff of Sangamon County.    Sheriff Williamson has held that office since 1994. (Ex.10, ¶1, Declaration of Williamson).

3.    Defendant Jack Campbell is the Undersheriff for Sangamon County.  Undersheriff Campbell has been employed with the Sangamon County Sheriff's Department since 1996, and he has held the position as Undersheriff since 2008. (Ex. 9, ¶1, Declaration of Campbell).

4.    Defendant Todd Krueger is a shift sergeant assigned to the third shift at the Sangamon County Jail.  In July of 2011 he was assigned to second shift.  (Ex. 3, Krueger Dep. p. 4, Lines 2-10).

5.    In July of 2011, Sgt. Krueger was one of Defendant Robert Beierman's supervisors.  (Ex. 3, Krueger Dep. p. 6, Lines 10-12).

6.    Defendant Tammy Powell is a Lieutenant with the Sangamon County Jail.  Lt. Powell has held this position since February 26, 2007. (Ex. 7, ¶1, Declaration of Powell).

7.    Defendant Guy Bouvet is a sergeant with the Sangamon County Jail.  Sgt. Bouvet has held this position since December 1, 2003. (Ex. 8, ¶1, Declaration of Bouvet).

8.    Defendant Robert Beierman is a correctional officer with the Sangamon County Jail.  Officer Beierman has worked for the department for 11 years.  (Ex. 2, Beierman Dep. p. 4, lines 1-6).

2

9.     Plaintiff is a convicted sexually dangerous person at the time of the events described herein. (Ex. 1, Pl. Dep. 51, Lines 10-12)[2].

10.    As of the date of this submission, Plaintiff is currently incarcerated at Big Muddy Correctional Center and receives weekly treatment as a convicted violent sex offender. (Ex. 1, Pl. Dep. p. 51, Lines 6-9, 53, Lines 2-19).

11.    Plaintiff has been at Big Muddy Correctional Center since approximately June 20, 2012. (Ex. 1, Pl. Dep. p. 6, Lines 10-11).

12.    Plaintiff has previously been in the Sangamon County Jail several times.[3]  (Ex. 1, Pl. Dep. p. 8, Lines 12-14).

13.    Plaintiff was first booked at the Sangamon County Jail on June 25, 1997 at the age of 17.  (Ex. 1, Pl. Dep. p. 8, Lines 9-11; Ex. 12, Kirby Declaration ¶9).

14.    Prior to July 20, 2011, Plaintiff had been booked at the Sangamon County Jail on 53 different occasions.  (Ex. 12, Kirby Declaration ¶10).

## B.  PROCEDURES AT THE SANGAMON COUNTY JAIL.

15.    All inmates are searched before they are housed in the general population. (Ex. 3, Krueger Dep. p. 13, Lines 15-20, p. 16, Lines 4-5; Ex 11, Durr Declaration ¶6).

16.    In general, the booking procedures for an inmate at the jail begin when either an arresting agency transports an inmate to the jail or the inmate is transferred from another correctional facility.   The inmate's personal belongings are removed with the exception the

---

[2] Plaintiff's status as a sexually dangerous person is not stated here to create prejudice. Rather, the purpose of this statement is to put context into the activities of the Defendants.  As explained herein, following the U.S. Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861 (1979), courts of appeal have generally ruled that a detainee held on a misdemeanor charge, not related to weapons or drugs, may not be strip searched absent individualized reasonable suspicion that the detainee is carrying contraband.

[3] Again, this is recited herein to demonstrate his knowledge and experience with procedures at the Sangamon County Jail.

inmate's clothing. The inmate is then placed in a booking cell.  (Ex. 3, Krueger Dep. p. 6, Lines 20-24 and p. 7, Line 1).

17.    The booking procedure entails searching the inmate for illegal items and contraband.  All of the inmate's personal belongings are logged and secured in a property bag. (Ex. 12, Kirby Declaration ¶11; Ex. 2, Beierman Dep. p. 6, Lines 8-12).

18.    An inmate is allowed to keep only a pair of pants and socks and only after those items have been searched to ensure there is nothing concealed therein. (Ex. 2, Beierman Dep. p. 6, Lines 12-13).

19.    The booking officer then questions the inmate and obtains all directory information about the inmate, such as age, date of birth, address, dependents, medication, medical conditions, prescriptions, etc. (Ex. 12, Kirby Declaration ¶12).

20.     Next, the inmate is photographed and fingerprinted and placed in a holding cell. (Ex. 12, Kirby Declaration ¶13).

21.    If the inmate is charged with a felony, the inmate must remain in the holding cell until arraignment by a judge.  (Ex. 12, Kirby Declaration ¶14).

22.    After arraignment, if the inmate cannot bond out, the classification officer will interview the inmate and classify the inmate for appropriate housing in the jail based on a variety of factors, including whether an inmate committed a felony or a misdemeanor against a person. (Ex. 12, Kirby Declaration ¶15).

23.    Once the classification officer has finished questioning the inmate, the property officer will perform the dressing out procedure with the inmate before placing the inmate in the general population of the jail.  (Ex. 12, Kirby Declaration ¶16).

24.    For strip searches, as differentiated from dressing out, a sergeant or a lieutenant is present, as well as the officer conducting the search and the agency requesting the search. (Ex. 2 Beierman Dep. p. 39, Lines 4-12).

25.    Strip searches are necessary from time to time to determine if an inmate's body is serving as a hiding place for various types of contraband.  (Ex. 11, Durr Declaration ¶8).

26.    It is the policy of the Sangamon County Jail that strip searches are to be conducted in a manner that will avoid unnecessary force, embarrassment, and indignity to the officers and inmates alike. (Ex. 11, Durr Declaration ¶ 7).

27.    Strip searches are done by a trained officer, and the inmate is informed in advance what actions are going to happen.  (Ex. 11, Durr Declaration ¶ 8).

28.    According to the policy of the Sangamon Count Sheriff's Office, strip searches are conducted by an officer of the same gender only when there is suspicion the inmate has in his/her possession contraband or other prohibitive materials.  The inspection is conducted in complete privacy. (Ex. 3, Krueger Dep. p. 27, Lines 16-24 and p. 28, Lines 1-10; Ex. 11, Durr Declaration ¶ 9).

29.    Strip searches of male inmates are done by male officers, except in emergencies. (Ex. 11, Durr Declaration ¶ 8).

30.    Strip searches are authorized by superior officers and conducted when there is probable cause that the inmate has possession of contraband or other prohibited materials. (Ex. 2, Beierman Dep. p. 6, Lines 22-24; Ex. 3, Krueger Dep. p. 7, Lines 16-19, p. 12, Lines 19-23; Ex. 11, Durr Declaration ¶ 9).

31.    Only a shift supervisor has the authority to authorize a strip search. (Ex. 3, Krueger Dep. p. 13, Lines 1-3).

32.     Work release and other inmates who have been released from custody are strip searched upon each re-entry into the facility after the release.  (Ex. 11, Durr Declaration ¶10).

33.     Strip Searches are valuable for the following purposes:

    a.     To prevent the introduction and/or manufacture of weapons or other dangerous contraband into or within the facility;

    b.     To discover and suppress "trafficking" of drugs or other contraband between inmates or between inmates and other individuals;

    c.     To enforce rules designed to eliminate unauthorized contact between inmates;

    d.     To discourage theft from any facility services or other inmates property;

    e.     To check for malicious waste or destruction of facility property;

    f.     To discover health or safety hazard which may go unnoticed during routine inspections;

    g.     To reduce contraband and detect hazards to the health and safety of all individual within the jail; and

    h.     To recover missing or stolen property and to prevent escapes or other disturbances.

(Ex. 11, Durr Declaration ¶11).

34.     After being strip searched, inmates are returned to the holding cell and then taken to the appropriate area/block in the jail.  (Ex. 2, Beierman Dep. p. 10, Lines 14-19).

35.     Strip searches are typically conducted in the property room. (Ex. 3, Krueger Dep. p. 8, Lines 3-4).

36.     In contrast, a "Dressing Out" or "Trans Up" search is performed for every inmate or pretrial detainee before that person is placed in the general population. This is done to assure that the inmate is not taking any prohibited items into the jail's general population. (Ex. 11, Durr Declaration ¶13; Ex. 2, Beierman Dep. p. 6, Line 24 and p. 7, Lines 1-2, p. 8, Lines 21-24).

6

37.    A "Dressing Out Sheet" lists the inmates that have been classified.  The officers refer to the Dressing out Sheet to identify those inmates who are ready to be placed in the general population.  (Ex. 11, Durr Declaration, ¶22; Ex. 2, Beierman Dep. p. 7, 10-13; Ex. 12).

38.    Generally, a dressing out procedure is performed by one officer. (Ex. 2, Beierman Dep. p. 39, Lines 2-3).

39.    In July of 2011, the dressing out policy of inmates at the Sangamon County Jail consisted of taking an inmate to the property room to be searched.  Once the search is complete, the inmate is taken to the holding cell and then another inmate is brought in. The policy is simply: one in, one out. (Ex. 2, Beireman Dep. p. 27, Lines 3-4, p. 40, Lines 1-13, p. 46, Lines 3-7, p. 12, Lines 2-4).

40.    Officer Beierman performs searches in the jail's property room with one inmate at a time.  Having more than one inmate in the room poses a safety concern to the officer and other persons in the jail. (Ex. 2, Beierman Dep. p. 17, Lines, 9-11, p. 20, Lines 20-24, p. 21, Lines 1-3, p. 46, Lines 3-7).

41.    The property room contains a privacy partition for use in the Dress Out. (Ex. 2, Beierman Dep. p. 19, Lines 4-11).

42.    Officer Beierman has never conducted a group Dress Out. (Ex. 2, Beierman Dep. p. 21, Lines 4-6).

43.    Officer Beierman has never witnessed any group Dress Outs at the Sangamon County Jail. (Ex. 2, Beierman Dep. p. 25, Lines 12-14).

**C. THE JULY 21, 2011 INCIDENT.**

44.    Plaintiff had been serving time at the Graham Correction Center when he was indicted in Sangamon County.  He was then transferred to the Sangamon County Jail on July 20,

2011 to be arraigned on the indictment. (Ex. 1, Pl. Dep. p. 9, Lines 12-15; Ex. 12, Kirby Declaration ¶18).

45.     From June 25, 1997 until July 20, 2011, Plaintiff had been housed in a cell block and dressed out on approximately 12 different occasions at the Sangamon County Jail. (Ex. 12, Kirby Declaration ¶17).

46.     Upon arrival at the Sangamon County Jail, Plaintiff was booked and placed in a holding cell waiting to be transferred to the general population.  (Ex. 1, Pl. Dep. p. 9, Lines 21-23).

47.     Plaintiff had been through the dressing out process before at the Sangamon County Jail during previous incarcerations. (Ex. 1, Pl. Dep. p. 13, Lines 6-8, p. 42, Lines 21-25 and p. 43 Line 1).

48.     On July 21, 2011, Officer Beierman was working as the property officer at the jail. (Ex. 2, Beierman Dep. p. 5, Lines 22-24 and p. 6 Line 1).

49.     Officer Beierman does not recall seeing Plaintiff on July 21, 2011.  (Ex. 2, Beierman Dep. p. 14, Lines 17-21).

50.     Although Officer Beierman does not recall seeing Plaintiff at that time and does not recall any Dress Outs for that day, he was the property officer on that date and responsible for performing the dressing out of inmates assigned to the general population.  (Ex. 2, Beierman Dep. p. 6, Lines 8-12, p. 14, Lines 17-21, p. 15, Lines 13-17).

51.     Plaintiff claims he was in the holding cell in the booking area when Officer Beierman retrieved him and took him to the property room.  (Ex. 1, Pl. Dep. p. 17-19, p. 11, Lines 1-3).

52.     At that time, Plaintiff was the only inmate in the holding cell. (Ex. 1, Pl. Dep. p. 11, Lines 20-21).

53.     Subsequently, Plaintiff stated that Officer Beierman escorted him, along with four or five other individuals, into the property room prior to being placed in the general jail population.  (Ex. 1, Pl. Dep. . p. 9, Lines 24-25, p. 10, Line 1, p. 11, Lines 13-21).

54.     When Plaintiff was taken into the property room, a small patch of what Plaintiff thought to be vomit was on the floor.  (Ex. 1, Pl. Dep. p. 15, Lines 19-22).

55.     Officer Beierman told Plaintiff avoid the vomit by saying "Step around it, gentlemen"[4] (Ex. 1, Pl. Dep. p. 15, Lines 22-24, p. 17, Lines 3-5).

56.     Plaintiff stepped around the vomit and never came into contact with it. (Ex. 1, Pl. Dep. p. 17, Lines 6-8).

57.     Plaintiff asked to speak to a sergeant to which Officer Beierman said "Don't make me spray you." (Ex. 1 Pl. Dep. p. 14, Lines 14-24, p. 15, Lines 8-14).

58.     Plaintiff felt the comment was disrespectful. That was the only thing he considered disrespectful.  (Ex. 1 Pl. Dep, p. 15, Lines 8-16).

59.     Officer Beierman allegedly ordered the inmates to "get naked, lift their sacks, bend at the waist and cough."  All the inmates complied. (Ex. 1, Pl. Dep. p. 40, Lines 21-23).

60.     Plaintiff told Officer Beierman that he didn't feel comfortable stripping in front of the other inmates.  (Ex. 1, p. 40, Lines 4-6).

61.     According to Plaintiff, Officer Beierman said, "If you don't want to stay in booking, then I suggest you get this done." (Ex. 1, Pl. Dep. p. 40, Lines 7-9).

62.     Plaintiff claims he was told to bend over, spread his buttocks and cough. (Ex. 1, Pl. Dep. p. 17, Lines 18-23).

---

[4] These statements are included in this Motion for the purposes of summary judgment only. Defendant does not admit the truth of the statements as he does not recall the incident in question.

63.    Plaintiff didn't like having to get naked in front of other men. (Ex. 1, Pl. Dep. p. 18, Lines 9-13).

64.    Subsequently, Plaintiff showered at the Sangamon County Jail where and when he was exposed to other men, nurses and correctional officers. (Ex. 1, Pl. Dep. p. 18, Lines 23-25, p. 19, Line 1).

65.    Officer Beierman was the only officer present in the property room for the Dress Out. (Ex. 1, p. 12, Lines 12-14).

66.    The entire Dressing Out lasted about 30 seconds. (Ex. 1, Pl. Dep. p. 17, Lines 24-25 and p. 18, Lines 1).

67.    After the Dress Out, Plaintiff requested to see a sergeant.  That request was denied at that time. (Ex.1, Pl. Dep. p. 35 Lines 19-23, p. 40, Lines 12-13).

**D. GRIEVANCES.**

68.    Plaintiff claims he filed a grievance about the search procedure the first week of August 2011.  No copy of the grievance can be found in the jail records and Plaintiff does not have a copy. (Ex. 1, Pl. Dep. p. 8-15).

69.    Plaintiff has copies of all the other grievances he filed. (Ex. 1, Pl. Dep. p.

70.    Plaintiff claimed he was subjected to a "strip search" in front of people in July of 2011. (Ex. 1, Pl. Dep. p. 24, Lines 16-20).

71.    Even if he had filed a grievance, Plaintiff waited until August to file his grievance. (Ex. 1, Pl. Dep. p. 24, Lines 21-24).

72.    A grievance, one separate from the one allegedly filed the first week of August, was filed on August 14, 2011 by Plaintiff requesting information on the "strip search." (Ex. 14).

73.    This grievance was responded to on August 18, 2011 by Sgt. Clemons. (Ex. 14).

74.     On August 21, 2011, Plaintiff filed another grievance requesting information on the "strip search" procedure. (Ex. 14).

75.     The August 21, 2011 grievance was responded to on August 26, 2011 by Sgt. Clemons. (Ex. 14).

76.     On September 22, 2011, Plaintiff filed another grievance contending that the Sangamon County Staff exposed him to other detainees not involved in the "strip search" process and violating his privacy and dignity. (Ex. 14).

77.     On October 12, 2011, Undersheriff Jack Campbell wrote a letter to Plaintiff in response to his complaint of September 27, 2011, regarding the actions of Officer Beierman on July 21, 2011, as well as to unrelated actions of Officers Ferro, Brents and Ball on September 4, 2009. (Ex. 14).

78.     Undersheriff Campbell advised that an investigation was conducted and Plaintiff's allegations could not be substantiated. (Ex. 14).

79.     On November 10, 2011, Plaintiff filed an inmate grievance inquiring about his options for the "strip search" on 7-21-2011. (Ex. 14).

80.     This grievance was forwarded to administration that same day. (Ex. 14).

81.     On or before November 15, 2011, Plaintiff filed another grievance requesting statements from his September 27, 2011 complaint he filed for litigation purposes (Ex. 14).

82.     This grievance was forwarded to Administration on November 15, 2011 and set for hearing. (Ex. 14).

83.     On November 18, 2011, a grievance hearing was held. On that day a memorandum from Lt. Loftus was given to Plaintiff outlining the result of the grievance hearing. (Ex. 14).

11

### E.  INVOLVEMENT OF OTHER DEFENDANTS.

84.    Sheriff Neil Williamson did not participate in the search of Plaintiff on July 21, 2011.  (Ex. 1, Pl. Dep. p. 19, Lines 6-11, Lines 15-16).

85.    At no time during Mr. Henderson's incarceration at the Sangamon County Jail did the Sheriff speak to Plaintiff or otherwise communicate with him. (Ex. 10, Williamson Declaration ¶4).

86.    The Sheriff was not present, nor was he personally involved with the dressing out procedure involving Plaintiff on July 21, 2011.  (Ex. 10, Williamson Declaration ¶5).

87.    Plaintiff claims in September of 2011 he wrote a request to the Sheriff informing him of the group searches.  (Ex. 1, Pl. Dep. p. 19, Lines 20-23, p. 20, Lines 4-9, p. 20, Lines 12-17).

88.    Plaintiff does not have a copy of the request form he claimed he sent to the Sheriff. (Ex. 1, Pl. Dep. p. 19, Lines 24-24).

89.    The Sheriff never received the request, never responded to Plaintiff's request, and the request cannot be found in the jail records. (Ex. 1, Pl. Dep. p. 20, Lines 10-11).

90.    Undersheriff Campbell never participated in the dress out of Plaintiff.  (Ex. 1, Pl. Dep. p. 21, Lines 24-24, p. 22, Lines 1-3).

91.    No personal involvement has been alleged against Undersheriff Campbell. (Ex. 1, Pl. Dep. p. 22, Lines 4-9, p. 31, Lines 13-18).

92.    At no time during Dmytryck Henderson's incarceration at the Sangamon County Jail did Undersheriff Campbell speak to Plaintiff or otherwise communicate with him. (Ex. 9, Campbell Declaration ¶4).

93.    Undersheriff Campbell was not present on July 21, 2011 at the location where Mr. Henderson was dressed out before being placed in the general population with other inmates. (Ex. 9, Campbell Declaration ¶5).

94.    Undersheriff Campbell did not observe the dressing out of Mr. Henderson and had no personal involvement with it.  (Ex. 9, Campbell Declaration ¶6).

95.    Sgt. Guy Bouvet was not present and had no direct involvement with the search of Plaintiff on July 21, 2011.  (Ex. 1, Pl. Dep. p. 37, Lines 9-10).

96.    No personal involvement has been alleged against Sgt. Bouvet. (Ex. 1, Pl. Dep. p. 37, Lines 11-15).

97.    During the week from Sunday, July 17, 2011 through Saturday, July 23, 2011, Sgt. Bouvet was out sick and did not attend work at the Sangamon County Jail. (Ex. 8, Bouvet Declaration ¶2).

98.    Sgt. Bouvet was not present on July 21, 2011 at the location where Mr. Henderson was dressed out before being placed in the general population with other inmates.  (Ex. 8, Bouvet Declaration ¶3).

99.    Sgt. Bouvet did not observe the dressing out of Mr. Henderson and had no personal involvement with it. (Ex. 8, Bouvet Declaration ¶4).

100.    Sgt. Todd Krueger was not involved in the dressing out of Plaintiff in July of 2011. (Ex. 3, Krueger Dep. p. 8, Lines 21-23).

101.    Sgt. Krueger was never informed about complaints from Plaintiff regarding a strip search. (Ex. 3, Krueger Dep. p. 9, Lines 1-9, p. 20, Lines 10-13).

102.    In July of 2011, Sgt. Krueger would not have issued an order to conduct either searches or Dress Outs in a group since it was not the policy of the Sangamon County Jail to do so. (Ex. 3, Krueger Dep p. 22, Lines 18-20).

13

103.    Sgt. Krueger was the acting sergeant when the search took place on July 21, 2011. (Ex. 1, Pl. Dep. p. 35, Lines 6-10).

104.    Plaintiff named Sgt. Krueger as a Defendant because Plaintiff concludes he did not enforce protocol on July 21, 2011. (Ex. 1, Pl. Dep. p. 35, Lines 11-13).

105.    Lt. Tammy Powell was not involved with the dressing out of Plaintiff on July 21, 2011.  (Ex. 1, Pl. Dep. p. 34, Lines 7-10).

106.    Lt. Tammy Powell was not present on July 21, 2011 at the location where Mr. Henderson was dressed out before being placed in the general population with other inmates. (Ex. 7, Powell Declaration ¶4).

107.    Lt. Powell did not observe the dress out of Mr. Henderson and had no personal involvement with it. (Ex. 7, Powell Declaration ¶5).

108.    From his previous incarcerations at the Sangamon County Jail, Plaintiff was aware that Lt. Powell oversaw second shift officers at the jail and asked to speak to her about the search. (Ex. 1, Pl. Dep. p. 32, Lines 10-18).

109.    On or about October 31, 2011, Plaintiff pulled Lt. Powell aside and told her about the search in July of 2011.  (Ex. 1, Pl. Dep. p. 34, Lines 11-20).

110.    Plaintiff did not speak with Lt. Powell about the July 21, 2011 search incident on any other occasion. (Ex. 1, Pl Dep. p. 34, Lines 21-23).

111.    Plaintiff never filed a grievance or sent a request to Lt. Powell about the search on July 21, 2011. (Ex. 1, Pl. Dep. p. 34, Lines 24-25, p. 35, Line 1).

### III.    ARGUMENT

Although Plaintiff refers to a "strip search," the evidence shows that on July 21, 2011, he was dressed out for admission to the general population.  Every inmate or pretrial detainee that comes into the Sangamon County Jail is subject to a search to prevent the introduction and/or

14

manufacture of weapons or other dangerous contraband into or within the jail. (Ex. 4, p. 2). Thus, for purposes of this motion, when the inmate is searched, the County Defendants are referring to the Dressing Out procedure. Irrespective of the nomenclature, however, the undisputed evidence, with it construed in a light most favorable to Plaintiff, demonstrates no constitutional violation, thus, compelling summary judgment for the Defendants.

  **a)  Summary Judgment Standard.**

  Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.56(c); *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986). The Court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the evidence, however, is "merely colorable, or is not significantly probative or merely raises 'some metaphysical doubt as the material facts,' summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. Overall, "[s]ummary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Durkin v. Equifax Check Services*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 995 (7th Cir. 2003)). Summary judgment is mandated when, after adequate time for discovery, the party who bears the burden of proof fails to make a showing sufficient to establish an essential element of that party's case. *Celotex*, 477 U.S. at 323.

  In order to overcome the undisputed facts set contained in this motion, Plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions or other admissible evidence showing a genuine dispute of material fact. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). Moreover, as the non-movant, a plaintiff must

offer more than a "mere scintilla of evidence" to survive summary judgment, conclusory allegations are insufficient to defeat a motion for summary judgment. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). The record reveals that Plaintiff has no such evidence and the County Defendants are entitled to judgment as a matter of law.

**A.     Plaintiff's was not subjected to a harassing, humiliating or painful search.**

A search of an inmate in the presence of other inmates does not in and of itself amount to a constitutional violation. Strip searches themselves are not per se unconstitutional. *Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004)(citing *Peckham v. Wis. Dep't of Corrections*, 141 F.3d 694, 697 (7th Cir. 1998). As the Court said in *Calhoun v. Detella,* 319 F.3d 936, 939 (7th Cir. 2003), "there is no question that strip searches may be unpleasant, humiliating, and embarrassing to prisoners, but not every psychological discomfort a prisoner endures amounts to a constitutional violation." In order for plaintiff to win on an Eighth Amendment claim of an unconstitutional search, he has to show that the searches were conducted in a harassing manner intended to humiliate and cause psychological pain." *Mays v. Springborn,* 575 F.3d 643, 649 (7th Cir. 2009) (citing *Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004) and *Calhoun v. Detella,* 319 F.3d 936, 939 (7th Cir. 2003)).

*Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861, 60 L.Ed. 2d, 447 1979), is the seminal authority to be considered when analyzing whether or not a visual strip search of a pretrial detainee is unlawful under the Fourth Amendment. The Supreme Court held that the jail's need for the search must be balanced against the inmate's privacy interest. Each case requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. While *Wolfish* did not validate all visual strip searches, nor did it invalidate them either.   Five years later, the U.S. Supreme Court held that prisoners do not have a right to privacy.  *Hudson v. Palmer*, 468 U.S. 517, 526-30, 104 S. Ct. 3194 (1984); *Johnson v. Phelan*,

16

69 F.3d 144, 146 (7th Cir. 1995) (pretrial detainee right to privacy claims rejected for being viewed by female officers).

In *Roscom v. City of Chicago,* 570 F. Supp. 1259 (N.D. Ill. 1983), a female pretrial detainee was visually searched in the presence of other female inmates. The female detainees were ordered to stand in a single file line and remove their clothes. After a frontal visual inspection, the detainees were instructed to turn around, spread their legs and bend over for a visual genital area search. Only women were in the room when the search took place and at no time did anyone touch the detainees. Relying on *Wolfish*, the Court concluded that the search was not constitutionally unreasonable.

In the case *sub judice*, even if Plaintiff's version of the facts is taken as true, *Roscom* demands judgment for the Defendants. According to Plaintiff, he was taken into a room with other male inmates. (DUMF 53). The inmates were instructed to remove their clothing, bend over, spread their buttocks and cough. (DUMF 59). This entire process took approximately 30 seconds. (DUMF 66). The visual searches were performed on the inmates since they were new to the jail and were going to be incarcerated in the general inmate population. (DUMF 36, 37).

No evidence has been presented that Officer Beierman touched Plaintiff, did anything to humiliate Plaintiff, or inflict any harm upon him. There is no evidence that the search was performed in a violent or harassing manner. The only evidence available reveals that Plaintiff didn't like having to take his clothes off in front of the other inmates. (DUMF 63). Plaintiff subjectively felt uncomfortable. (DUMF 60). There is no evidence to suggest that the visual search was done in a violent matter or that Officer Beierman did anything to demean or objectively humiliate Plaintiff. "To state a due process claim, plaintiff must allege that the strip search was 'conducted in a harassing manner intended to humiliate and inflict psychological pain.'" *Streeter v. Sheriff of Cook County*, 576 F. Supp.2d 913, 918 (2008) (citing *Calhoun v.*

*DeTella*, 391 F.3d 936, 939 (7th Cir. 2003).  "Only those strip searches that are 'maliciously motivated, unrelated to institutional security, and hence totally without penological justification are considered unconstitutional.'" *Streeter* at 913.  The due process clause of the Fourteenth Amendment prohibits only the wanton and unnecessary infliction of pain on pretrial detainees, and forbids punishment without penological justification that result in the gratuitous infliction of suffering. *Id*.  Here, however, even Plaintiff admits that the only disrespectful event was Officer Beierman's statement, "Don't make me spray you" that he felt was disrespectful. (DUMF  57). Stray marks, while unprofessional, do not violate the constitution. "Standing along, simple verbal harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws." *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (citing Ivey v. Wilson, 832 F.2d 950, 955(6th Cir. 1987) (*per curiam*) (Eighth Amendment); *Patton v. Przyblski*, 822 F.2d 697, 700 (7th Cir. 1987) (due process). The evidence before the Court is not sufficient evidence to send this case to trial.

On July 20, 2011, Plaintiff didn't like getting undressed in front of other men for the Dress Out.  (DUMF 63).  However, curiously, he had to undress in front of others when he showered. (DUMF 64).  On 12 occasions prior to July 21, 2011, Plaintiff was dressed out and housed at the Sangamon County Jail. (DUMF 45; Ex. 15).  Not only was Plaintiff no stranger to the system and the dressing out procedure, he has never alleged or demonstrated that Officer Beierman did anything to humiliate him or inflict psychological pain.

In the *Fillmore* supra, the Court held that in order to prevail, a plaintiff had to show the strip search was "conducted in a harassing manner intended to humiliate and inflict psychological pain." *Fillmore* at 505.  In *Fillmore*, plaintiff claimed he was subject to excessive force during and after his transfer to prison's segregation unit.  Plaintiff was taken in a vacant cell and strip-searched by an officer in the presence of several other inmates. Each of the usual body

18

locations were examined five times.  The Court held the strip-search was conducted in a discreet and expeditions manner. The principle injury claimed by plaintiff was subjective humiliation. However, nowhere did Plaintiff allege that the search was done in a violent manner.  Thus, the search involved a de minimus application of force and lacked the requisite showing of malice. *Fillmore* at 505.  Just as in *Fillmore*, Plaintiff has failed to demonstrate the search was performed in a violent manner or intentionally done to harass Plaintiff.

Even though there might be contradictory facts in this case regarding who was present and other matters, they are not material to deciding Defendants' motion.  Plaintiff claims a group search occurred. (DUMF 53-66)  Officer Beierman denies that the dressing out procedure was done in a group (DUMF 42). Although Officer Beierman does not specifically remember, he maintains that he followed the standard operating procedure of one in/one out. (DUMF 39, 40). Regardless of whether or not the dressing out was performed individual or in a group, these differences are immaterial since there is no evidence that the search was performed in a hurtful or demeaning manner. Objectively, the search was performed in a reasonable manner as a prudent precaution against smuggling drugs and other contraband into prison. *Wolfish*, 441 U.S. at 558-60.

Taking Plaintiff's facts in a light most favorable to him, even if the visual search did occur in a group, there is no evidence that any of Officer Beierman's actions were humiliating, embarrassing, condescending or hurtful. Plaintiff may have complained about a mess on the floor, but, according to Plaintiff, Officer Beierman responded by saying, "step around it, gentlemen." (DUMF 55). There is no evidence that the procedure was done for any reason other than a pure penological reason of ensuring the safety of the facility, the inmates and those who work there. (DUMF 36). Plaintiff has failed to present any evidence that the search performed on

Plaintiff was not a legitimate search or that it was not objectively reasonable thus mandating summary judgment.

**B.    Plaintiff Has Not Established A Genuine Issue Of Material Fact So As To Trigger Municipal Liability On The Part Of Sangamon County.**

   **a)    Searching of Inmates Policy**

The Supreme Court has held that "municipalities cannot be held liable under Section 1983 claims under a theory of *respondeat superior*." *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690-91 (1978)). Unconstitutional policies or customs can take three forms:

(1)    An express policy that, when enforced, causes a constitutional deprivation;

(2)    A wide spread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of loss; or

(3)    An allegation that the constitutional injury was caused by a person with final policymaking authority.

*Palmer*, 327 F. 3d at 595 (*citing Garrison v. Burke*, 165 F. 3d 565, 571 (7th Cir. 1999); *accord Perkins v. Lawson*, 312 F. 3d 872, 875 (7th Cir. 2002); *Brokaw v. Mercer County*, 235 F. 3d 1000, 1013 (7th Cir. 2000)).

If Plaintiff is alleging that Sangamon County had an improper policy as it pertains to the searching of inmates, he failed to present any facts to support this claim. Plaintiff is required to establish that Sangamon County had such a custom or policy regarding the dressing out procedure that must have some nexus to his resulting injury. *Palmer*, 327 F. 3d at 594. In short, "there must be an affirmative link between the policy and the particular constitutional violation alleged." *Id.* (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). Here, we have none of that.

Furthermore, if this Court concludes that the Officer Beierman did not violate Plaintiff's constitutional rights, no claim may lie against Sangamon County because municipal liability for a constitutional injury requires a finding that the individual officer is liable on the underlying substantive claim. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000) (no municipal liability absent underlying constitutional violation); *Estate of Phillips v. Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997); *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994). In a nutshell, if Officer Beierman did not commit a constitutional violation, then Sangamon County cannot be held liable for the alleged constitutional violations.

## C.    Defendants Lack Personal Involvement.

### a)    Personal Involvement Standard.

Individual liability under Section 1983 cannot be based on a theory of *respondeat superior*; instead, allegations of personal wrongdoings are essential to maintain such a claim. *Jackson v. DeTella*, 998 F. Supp. 901, 904 (1998) (citing *Jones v. City of Chicago*, 856 F.2d 985, 922 (7th Cir.1995)). "The personal responsibility requirement is satisfied if the conduct causing the constitutional deprivation occurs at the direction of a defendant in a supervisory position or with his knowledge and consent." *Jackson* 856 F.2d at 922 (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.1995); *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir.1985)).

Although direct participation by a defendant is not necessary in order to establish liability under Section 1983, there must be some showing that the defendant acquiesced in some demonstrable way in the alleged constitutional violation. *Palmer v. Marion County*, 327 F. 3d 588, 594 (7th Cir. 2003) (citing *Kelly v. Municipal Courts of Marion County*, 97 F. 3d 902, 909 (7th Cir. 1996); *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986)); *see also*, *Sanville v. McCaughtry*, 266 F. 3d 724, 740 (7th Cir. 2001). In order to hold a supervisory defendant liable,

the plaintiff must demonstrate that the supervisor knew about the unconstitutional conduct, facilitated it, approved it, condoned it, or purposely turned a blind eye to it for fear of what he might see. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1992). The supervisor must have also had a realistic opportunity to intervene. *Lanigan v. Village of East Hazel Crest, III*, 110 F.3d 467, 477-478 (7th Cir. 1997); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

   b)    **Sheriff Williamson, Undersheriff Campbell, Sgt. Krueger, Sgt. Bouvet and Lt. Powell cannot be held liable simply because they were superior officers, they were not personally involved.**

Plaintiff admitted in his deposition that Sheriff Williamson, Undersheriff Campbell, Sgt. Krueger, Sgt. Bouvet and Lt. Powell were not present on July 21, 2011 when he was incarcerated in the Sangamon County Jail and subjected to the dressing out procedure before being placed in the general population with the other inmates. (DUMF 84, 90, 91, 95, 96, 100, 105). Plaintiff admitted that he named these Defendants merely because they were superior officers and because they had the obligation to see the Sangamon County Jail procedures were followed properly. (DUMF 104). Plaintiff has not produced any evidence that these County Defendants knew of, caused or participated in the strip search. All Plaintiff has pled are conclusory allegations that since they were superior officers, they had to have condoned the alleged conduct. Defendants Williamson, Campbell, Powell, Kruger and Bouvet have all attested to the fact they were not present on July 21, 2011 for the dressing out procedure, nor were they personally involved, let alone that they approved or condoned the claimed conduct. (DUMF 85-86, 93-94, 98-99, 100, 106-107).

For an individual to liable, s/he must be personally responsible for the deprivation of a constitutional right. *Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001). In order to establish individual liability, Plaintiff must show a causal relationship between his alleged injuries and a defendant's alleged misconduct. *Murrell v. Bukowski*, 08-2044, 2011 WL 884736 (C.D. Ill. Mar.

22

11, 2011)(citing *Wolf–Lillie v. Songquist,* 699 F.2d 864, 869 (7th Cir.1983)).  As such, Plaintiff must establish that each defendant "caused or participated in the alleged constitutional deprivation." *Id.; See also Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir.1995).  Sgt. Bouvet has established that he wasn't even at work the week Plaintiff's claims his rights were violated. (DUMF 97).    Since Sgt. Bouvet wasn't even at the facility, he certainly cannot be held accountable.   Plaintiff has failed to establish a causal relationship between any of the other Defendants' conduct and his alleged constitutional rights' violation thus mandating summary judgment for the Defendants.

## D.    The Defendants Are Entitled to Qualified Immunity.

Qualified Immunity has two distinct inquiries:  (1)  whether the conduct at issues violates plaintiff's constitutional rights; and (2) whether the violated policy was clearly established at the time of the alleged misconduct, i.e.*,* that it contours where sufficiently clear that a reasonable official would understand that what he is doing violates that right.  *See, e.g. Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001); *White v. City of Markham*, 310 F.3d 989 (7th Cir. 2002); *Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, (1982).

Qualified Immunity protects government officials "from liability for civil damages in so far as their conduct does not violate clearly established statutory constitutional rights of which a reasonable person would have known."  *Harlow,* 457 U.S. at 818.  "Qualified Immunity balances two important interests – the need to hold public officials accountable when they exercise power responsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government officials err is "a mistake of law, mistake of fact, or mistake based on mixed questions of law and fact."" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004), (Kennedy, J. dissenting) (citing *Butz v. Economou*, 438 U.S. 478507 (1978)) (noting that

Qualified Immunity covers "mere mistakes in judgment, whether a mistake is one of fact or one of law.").

The case of *Pearson v. Callahan*, 129 S.Ct. 808 (2009), holds that the two step sequential process of *Saucier* is no longer required.  "Instead, we must determine whether, operating under the state of the law as it existed at the time of relevant events, "a reasonable officer would have known that the particular action at issue . . . was unlawful.""  *Lewis v. Downey,* 581 F.3d 467, 478-479 (7th Cir. 2009) (quoting *Juriss v. McGowen,* 957 F.2d 345, 350 (7th Cir. 1992))(other citations omitted).

Strip searches themselves are not per se unconstitutional.  In this case, the Dress Out was done to insure that none of the inmates had any weapons or other dangerous items on their person before being housed within the jail.  The Dress Out was done to ensure the safety and security of the facility. (DUMF 36).  This was a legitimate reason to conduct the search.

## CONCLUSION

Discovery has concluded.  Yet Plaintiff has field to present any evidence suggesting a constitutional violation. Accordingly, summary judgment must be entered for all Defendants.

/s/ Raylene DeWitte Grischow
Raylene DeWitte Grischow #6257514
E-mail:  rgrischow@hinshawlaw.com
Andrew M. Ramage  #6256554
E-mail:  aramage@hinshawlaw.com
Hinshaw & Culbertson LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
Telephone: 217-528-7375
Facsimile: 217-528-0075
Attorneys for Defendants

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 29, 2014, I electronically filed the foregoing **Defendants'
Memorandum in Support of its Motion for Summary Judgment** with the Clerk of Court
using the CM/ECF system that will send notification of such filing(s) to the following:

Aaron S. Galloway                          E-mail:  aaron.s.galloway@gmail.com

and I hereby certify that on August 29, 2014, I mailed a true and correct copy of the
foregoing document via the United States Postal Service, first-class postage pre-paid to the
following non-registered participants:  NONE

/s/ Raylene DeWitte Grischow
Raylene DeWitte Grischow #6257514
E-mail:  rgrischow@hinshawlaw.com
Hinshaw & Culbertson LLP
400 South Ninth Street, Suite 200
Springfield, IL 62701
Telephone: 217-528-7375
Facsimile: 217-528-0075
Attorneys for Defendants NEIL M. WILLIAMSON,
JACK CAMPBELL, ROBERT BEIERMAN,
TAMMY POWELL, TODD KRUEGER, GUY
BOUVET and COUNTY OF SANGAMON

25