IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| DMYTRYCK HENDERSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 12-3069-TSH |
| ) | |
| ) | |
| NEIL M. WILLIAMSON, JACK CAMPBELL, ) | |
| ROBERT BEIERMAN, TAMMY POWERLL, ) | |
| TODD KRUGER, GUY BOUVET, and ) | |
| COUNTY OF SANGAMON, ) | |
| ) | |
| Defendants. ) | |

**OPINION**

**TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:**

This cause comes before the Court on Defendants' motion for summary judgment. As explained more fully *infra*, Defendants are entitled to summary judgment because there are no genuine issues of material fact that must be determined by a trier of fact and Defendants have shown that they are entitled to judgment as a matter of law.

**I.
LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT**

All Defendants (moving parties) have filed a Motion for Summary Judgment (d/e 90). Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving parties are entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Ruiz-Rivera v. Moyer,* 70 F.3d 498, 500-01 (7th Cir. 1995). The moving parties have the burden of

providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). The Court must consider the evidence presented in the light most favorable to the non-moving party. Any doubt as to the existence of a genuine issue for trial must be resolved against the Defendants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once the moving parties have met their burden, the plaintiff must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Gracia v. Volvo Europa Truck, N.V.,* 112 F.3d 291, 294 (7th Cir. 1997). "[A] party moving for summary judgment can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993).

Accordingly, the plaintiff cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue; he "'must do more than simply show that there is some metaphysical doubt as to the material fact.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57 (1986)(quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)); *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 818 (7th Cir. 1999). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 250.

# II.
## DEFENDANTS WILLIAMSON, CAMPBELL, POWELL, KRUEGER, AND BOUVET ARE ENTITLED TO SUMMARY JUDGMENT

**A.     Defendants Williamson, Campbell, Powell, Krueger, and Bouvet lacked the personal involvement necessary to be liable to Henderson under § 1983.**

In July 2011, Plaintiff was an inmate within the Illinois Department of Corrections ("IDOC") who had been returned to the Sangamon County Jail ("the Jail") in order to be arraigned on an indictment from Sangamon County. Henderson was housed at the Sangamon County Jail starting on July 20, 2011.

During the relevant time, Defendant Neil Williamson was the Sheriff of Sangamon County, Illinois. Defendant Jack Campbell was the Undersheriff for Sangamon County. Defendant Todd Krueger was a shift sergeant at the Jail. Defendant Tammy Powell was a lieutenant at the Jail. Defendant Guy Bouvet was a sergeant at the Jail. Finally, Defendant Robert Beierman was a correctional officer at the Jail. Beierman was the only Jail official present at the time of the search that forms the basis for this suit.

"[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010)(quoting *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003)). Indeed, the United States Court of Appeals for the Seventh Circuit has explained that the doctrine of *respondeat superior* (a doctrine whereby a supervisor may be held liable for an employee's actions) has no application to § 1983 actions. *Gayton v. McCoy*, 593 F.3d 610, 622 (7th Cir. 2010). Instead, in order for a supervisor to be held liable under § 1983 for the actions of his subordinates, the supervisor must "approve[] of the conduct and the basis for it." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)("An official satisfies the

personal responsibility requirement of section 1983 . . . if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent.")(internal quotation omitted). "[S]upervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Backes v. Village of Peoria Heights, Illinois*, 662 F.3d 866, 870 (7th Cir. 2011) (quoting *Chavez*, 251 F.3d at 651)). "In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery." *Gentry*, 65 F.3d at 561.

Here, Henderson has admitted that there are no questions of fact surrounding Defendants Williamson, Campbell, Powell, Krueger, and Bouvet's lack of involvement in his strip search. (See Defendants' Statement of Material Undisputed Facts (d/e 91), paragraphs 84-107, Plaintiff's Response to Motion for Summary Judgment (d/e 93). These Defendants did not have anything to do with the search about which Henderson complains. The only officer in the room when the search occurred was Beierman. As such, Henderson tacitly concedes that summary judgment is appropriate as to Defendants Williamson, Campbell, Powell, Krueger, and Bouvet, and the Court agrees. Accordingly, Defendants Williamson, Campbell, Powell, Krueger, and Bouvet's motion for summary judgment is granted because they lacked the personal involvement necessary to impose liability upon them under § 1983.

**B.     Considering the evidence in the light most favorable to Henderson, no question of fact exists that requires a jury trial.**

### Statement of Facts

The following facts are either undisputed or are viewed in a light most favorable to Henderson. When an inmate/detainee/arrestee arrives, the Jail's personnel follow certain intake procedures in accepting that person for holding at the Jail. All inmates are searched before they

4

are housed in the Jail's general population. (Krueger deposition, pg. 13, lines 15-20, pg. 16, lines 4-5, Durr Declaration, para. 6). In general, the booking procedures for an inmate at the Jail begin when either an arresting agency transports an inmate to the Jail or the inmate is transferred from another correctional facility. (Krueger deposition, pg. 6, lines 20-24, pg. 7, line 1). The inmate's personal belongings are removed with the exception the inmate's clothing, and then, the inmate is placed in a booking cell. *Id.*

The booking procedure entails searching the inmate for illegal items and contraband. All of the inmate's personal belongings are logged and secured in a property bag. (Kirby Declaration, para. 11, Beierman deposition, pg. 6, lines 8-12). An inmate is allowed to keep only a pair of pants and socks and only after those items have been searched to ensure that there is nothing concealed therein. (Beierman deposition, pg. 6, lines 12-13). The booking officer, then, questions the inmate and obtains all directory information about the inmate such as age, date of birth, address, dependents, medication, medical conditions, and required prescriptions. (Kirby Declaration, para. 12). *Id.*

Next, the inmate is photographed and fingerprinted and placed in a holding cell. If the inmate is charged with a felony, the inmate must remain in the holding cell until arraignment by a judge. *Id. at para. 13.* After an arraignment, if the inmate cannot bond out, the classification officer will interview the inmate and will classify the inmate for appropriate housing in the Jail based on a variety of factors, including whether an inmate committed a felony or a misdemeanor against a person. *Id. at para. 15.* Once the classification officer has finished questioning the inmate, the property officer will perform a search procedure with the inmate before placing the inmate in the Jail's general population. *Id. at para. 16.*

Strip searches are typically conducted in the property room of the jail. (Defendants' Undisputed Facts (d/e 91), paragraph 35). A search is performed for every inmate or pretrial detainee before that person is placed in the Jail's general population. (Durr Declaration, para. 13, Beierman deposition, pg. 6, line 24, pg. 7, lines 1-2, pg. 8, lines 21-24). While the Defendants, in their Motion and statements of fact, refer to the search as a "dressing out" or "trans up", taking the evidence in the light most favorable to the Plaintiffs, the procedure followed in this case is construed and referred to as a group strip search as described in the Plaintiff's deposition testimony (Exhibit 1 to Plaintiff's Response (d/e 93) and will be referred to as a "strip search" or "group strip search".[1]

The search done prior to placing an inmate in the Jail's general population is done to ensure that the inmate is not taking any prohibited items into the Jail's general population. (Durr Declaration, para. 13, Beierman deposition, pg. 6, line 24, pg. 7, lines 1-2, pg. 8, lines 21-24).

In July of 2011, the Jail's search policy consisted of taking inmates to the property room to be searched prior to being placed in the Jail's general population. (Beierman deposition, pg. 27, lines 3-4, pg. 40, lines 1-13, pg. 46, lines 3-7, pg. 12, lines 2-4).

Henderson had been serving a sentence at Illinois State Department of Corrections facility Graham Correctional Center (Graham). When he was indicted in Sangamon County, he was then transferred to the Jail on July 11, 2011 to be arraigned on the Sangamon County indictment. (Defendants' Statement of Undisputed Facts (d/e 91), paragraph 44). This was not Henderson's first visit to the Jail. From June 25, 1997 until July 20, 2011, Henderson had been

---

[1] The Court is cognizant that many of the facts in this Statement of Facts are disputed by Defendant Beierman. For instance, Beierman asserts that he has never conducted a group strip search before placing a prisoner in population (Defendants' Undisputed Facts (d/e 91), paragraph 42), and has never witnessed a group strip search at the Sangamon County Jail (Defendant's Undisputed Facts (d/e 91), paragraph 43). The Plaintiff's deposition testimony contradicts this assertion. For purposes of this motion and the following statement of facts, the evidence regarding this Summary Judgment Motion is taken in the light most favorable to the Plaintiff.

housed in a cell block in the Jail and searched on approximately twelve different occasions at the Jail. (Defendants' Statement of Undisputed Facts (d/e 91), paragraph 46). Upon arrival at the Jail from Graham, Henderson was booked and placed in a holding cell waiting to be transferred to the general population. (Henderson deposition, pg. 9, lines 21-23).

On July 21, 2011, Beierman was working as the property officer at the Jail. (Beierman deposition, pg. 5, lines 22-24, pg. 6, line 2). Beierman acknowledges that he was the property officer on that date and was responsible for performing the searches of inmates assigned to the general population on that day.[2]

Henderson was in the holding cell in the booking area when Beierman retrieved him and took him to the property room. (Plaintiff's deposition, pg. 10, lines 17-19.) Subsequently, Beierman escorted Henderson along with five other individuals into the property room which had been designated as a strip search area. (Plaintiff's deposition, pg. 11, lines 1-22).

As Henderson indicated, he had previously been through this procedure at the Sangamon County Jail. He noted that prior searches had been conducted by different officers who do the search a little bit differently, but in this particular situation, it was "a little egregious". (Plaintiff's deposition, pg. 13, lines 7-16).

---

[2] Beierman disputes Henderson's testimony and claims that Henderson was subjected to a "group dress out" or "trans up" performed by Beierman on that day. In his Motion for Summary Judgment, Beierman makes much of the fact that Henderson received a "dress out" or "trans up" rather than a "strip search." Nevertheless, Beierman testified during his deposition that there is little difference between the two types of searches. In fact, Beierman stated that the procedure is the same for both. Specifically when asked if there was a "difference between the search prior to being transferred to general population and the strip search for contraband described in the officer's handbook" Beierman stated it was the same procedure. (Beierman deposition, pg. 39, lines 23-24, pg. 40, lines 1-20). The purpose of both types of searches is to search for contraband. For purposes of this suit, the nomenclature of the search is a distinction without a difference. Whether a "dress out", "trans up", or strip search, the balancing test remains the same, and the test is whether the scope and manner of the search is justified and whether it is reasonable considering the circumstances and where the search is performed. *Bell*, 441 U.S. at 559. Taking the evidence in the light most favorable to Henderson, the Court interprets the evidence to show that Beierman subjected Henderson to a group strip search on the day in question.

When asked what was egregious about the situation, Henderson indicated it was unsanitary and "it was like the tone, you know, he was kind of disrespectful with it". (Plaintiff's deposition, pg. 13, lines 17-20). When asked again what was egregious about this particular search, he indicated that he believed the way Beierman treated him when he requested to see a sergeant, and Beierman's refusal, was "kind of disrespectful". Henderson also said the room was unsanitary because there was vomit on the floor "like somebody was drunk in there prior to us". Henderson indicated that Beierman did not want to clean the vomit up and told them just "step around it". (Plaintiff's deposition, pg. 14, lines 12-21). When asked specifically what Beierman said that he believed was disrespectful, Henderson indicated Beierman said "don't make me spray you". (Plaintiff's deposition, pg. 14, lines 22-24).

Henderson indicated that there was nothing else disrespectful about the strip search procedure. (Plaintiff's deposition, pg. 15, lines 4-15).

When asked to describe what was on the floor, Henderson indicated it looked like vomit and smelled really bad. The vomit was located about two or three feet into the property room. (Plaintiff's deposition, pg. 15, lines 17-25). He indicated that the vomit was about a foot to the left from the door. He indicated the pool was about a foot round with splashes which may have gone out to two feet. (Plaintiff's deposition, pg. 16, lines 1-18). Henderson pointed the vomit out to Beierman, and Beierman's exact response was "step around it gentlemen". Henderson indicated he stepped around the vomit. (Plaintiff's deposition, pg. 16, lines 1-25, pg. 17, lines 1-8). There is no evidence that any of the inmates came into contact with the vomit located on the property room floor to the left of the door.

After being told to step around the vomit, Henderson asked to speak to a sergeant, but Beierman denied his request by saying, "Don't make me spray you." *Id*. at pg. 14, lines 14-24,

pg. 15, lines 8-14, pg. 15, lines 8-16, pg. 57, lines 1-11. Henderson felt that the comment was disrespectful, and he understood the comment to mean that Beierman would use pepper spray on him if he did not comply. *Id.* Beierman then ordered the other inmates and Henderson to "get naked, lift their sacks, bend at the waist, and cough." *Id*. at pg. 40, lines 21-23. Henderson informed Beierman that he didn't feel comfortable stripping in front of the other inmates, but Beierman was unsympathetic and stated: "If you don't want to stay in booking, then I suggest you get this done." *Id*. at pg. 40, lines 4-9. All of the inmates, including Henderson, complied with Beierman's order even though Henderson didn't like having to get naked in front of other men. *Id*. at pg. 19, lines 9-13.

When asked if there was anything else about the incident that he found egregious, Henderson replied "having to strip search in front of guys he didn't know and being told to bend over and spread his cheeks and cough". (Plaintiff's deposition, pg. 17, lines 18-23). Plaintiff indicated that when he was booked by other officers in the past, he had been asked to strip, but they didn't require him to do the bending and spreading. (Plaintiff's deposition, pg. 18, lines 1-8, pg. 13, lines 21-25, pg. 14, lines 1-11).

The entire process lasted a short time, and the whole incident of the officer telling them to bend over and cough lasted only thirty seconds. (Plaintiff's deposition, pg. 10, lines 2-11, pg. 17, lines 24-25, pg. 18, line 1).

On February 29, 2012, Henderson filed this suit against Defendants under 42 U.S.C. § 1983. Defendants have now moved for summary judgment on Henderson's claim against them.

# III.
# CONSIDERING THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO PLAINTIFF, BEIERMAN IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

The Court finds that in taking the facts in the light most favorable to the Plaintiff, no genuine issue of material fact exists as to Defendant Beierman and that he is entitled to judgment as a matter of law. Although Henderson was and is an inmate within the IDOC, he was a pretrial detainee when he was housed at the Jail in July 2011. As such, Henderson's "claim arises under the Fourteenth Amendment's Due Process Clause but is governed by the same standards as a claim for violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Smith v. Sangamon County Sheriff's Dept.*, 715 F.3d 188, 191 (7th Cir. 2013); *Rosario v. Brawn*, 670 F.3d 816, 820-21 (7th Cir. 2012)("Although the Eighth Amendment applies only to convicted persons, pretrial detainees . . . are entitled to the same basic protections under the Fourteenth Amendment's due process clause, and we apply the same deliberate indifference standard in both types of cases.")(internal quotation omitted).

"The Eighth Amendment prohibits punishments which involve the unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification." *Meriwether v. Faulkner,* 821 F.2d 408, 415 (7th Cir. 1987)(citing *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981); *Caldwell v. Miller,* 790 F.2d 589, 600 (7th Cir. 1986)). In evaluating Eighth Amendment claims, courts conduct both an objective and a subjective inquiry. The objective prong asks whether the alleged deprivation or condition of confinement is "sufficiently serious" so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)(quotations omitted). If the conditions complained of pass this threshold, courts then must determine the prison official's subjective state of mind; that is,

whether "he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847; *Johnson v. Phelan,* 69 F.3d 144, 149 (7th Cir. 1995).

In determining whether a bodily search passes constitutional muster, a court must balance the detainee's constitutional rights with the security concerns of the institution, the scope of the intrusion, the manner in which the search is conducted, the justification for the search, and the place at which the search is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Only those searches that are "maliciously motivated, unrelated to institutional security, and hence 'totally without penological justification' are considered unconstitutional." *Meriwether,* 821 F.2d at 418 (quoting *Rhodes,* 452 U.S. at 346); *Calhoun v. DeTella,* 319 F.3d 936, 939 (7th Cir. 2003). In other words, the search must amount to "'calculated harassment unrelated to prison needs,'" *Meriwether,* 821 F.2d at 418 (quoting *Hudson v. Palmer,* 468 U.S. 517, 530 (1984)), with the intent to humiliate and inflict psychological pain. *Fillmore v. Page,* 358 F.3d 496, 505 (7th Cir. 2004)(citing *Calhoun,* 319 F.3d at 939). Even if a valid penological reason exists for the search, "the manner in which the search [was] conducted must itself pass constitutional muster." *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013).

The Seventh Circuit, in *Meriwether v. Faulkner*, 821 F.2d at 418 (citing *Bell*, 441 U.S. at 537), observed as follows: With respect to plaintiff's claim that she is regularly forced to strip before guards and other inmates, it should be noted that "[a] prisoner's expectation of privacy is extremely limited in light of the overriding need to maintain institutional order and security."

Following the *Meriwether* decision, the court in *Headrick v. Watson*, 2013 WL 6822103, *2 (S.D. Ill. Dec. 26, 2013), noted that:

> A search of several prisoners together is not unconstitutional in and of itself. There is no question that strip searches may be unpleasant, humiliating, and

embarrassing to prisoners, but not every psychological discomfort a prisoner endures amounts to a constitutional violation. For example, the strip search of a male prisoner in front of female officers, if conducted for a legitimate penological reason, would fail to rise to the level of an 8th Amendment violation." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003).

Henderson does not argue that the search had no penological interest, and rightfully so as it clearly did. The purpose of the search was to ensure the safety of the other detainees and the staff by preventing the introduction of weapons or other dangerous contraband into the Jail.[3]

Instead, Henderson contends that the manner in which Beierman conducted the search does not pass constitutional muster. Henderson points to the following facts in support of his argument that a genuine issue of material fact exists that precludes summary judgment in Beierman's favor.

First, Henderson contends that Beierman forced him to remove all of his clothing, to manipulate his body to reveal his genitals and other private areas, and that this occurred in front of five other inmates or detainees. Henderson claims that having a group strip search that required him to expose himself in such a manner violated his constitutional rights because a group strip search violated the Jail's internal policies regarding strip searches and one-on-one searches.

Second, Henderson states that there was vomit on the floor during the search that left an unpleasant smell. Henderson asserts that, when he expressed concerns about the search,

---

[3] The policies of Sangamon County Jail. Chapter 08: Security and Control, Article 08-008 Search of Inmates (Defendants' Exhibit 4) indicate as follows: Purposes of Searches: Searches are especially valuable for the following purposes: 1. To prevent the introduction and/or manufacturing of weapons or other dangerous contraband into or within the facility. (Section IV, Procedures (A)(1)); 3. Strip searches will be conducted by qualified employees when there is suspicion that the prisoner/inmate has in his/her possession contraband or other prohibited materials. This inspection will be conducted in complete privacy and in a professional manner. Work release and other periodic custodial prisoners/inmates will be strip searched upon each entry into the facility. (Section IV, Procedures (B)(3)).

12

Beierman told Henderson he needed to cooperate or Beierman would "spray" him. Henderson understood this statement to mean that Beierman would spray him with pepper spray.

Third, Henderson argues that he was denied the right to speak with a sergeant either before or after the search occurred so that he could voice his objection to the search because it made him feel uncomfortable and disrespected.

Henderson argues that these facts are sufficient to require a jury trial on the issue of whether Beierman's strip search of him was reasonable, and Henderson points to the Seventh Circuit's opinion in *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009) as support for his argument that a jury trial is necessary. In *Mays* the Seventh Circuit reversed the trial court's decision which denied presentation of plaintiff's strip search claim to a jury. (Plaintiff's Response, d/e 93, pg. 5).

*Mays* is distinguishable from the facts in this case. In *Mays*, "[t]he plaintiff's evidence was that the searches were group searches that gratuitously exposed to other prisoners the nudity of each prisoner being searched and that the guards conducted the searches wearing dirty gloves in a freezing basement and uttering demeaning comments to the prisoners being searched, for example comments about their private parts." *Mays*, 719 F.3d at 634. More specifically, in *Mays* the plaintiff testified that a memo from the prison's chief of security was distributed to prison guards reminding them of a rule that public searches were not allowed except in emergency situations. Mays testified that during one of the routine daily strip searches he showed one guard the memo from the prison's chief of security reaffirming the prison's rule against public searches. Mays testified that he saw the guard to whom he showed the memo nod at the guard who was to search him. Mays testified the two guards, smirking according to Mays, said they saw something in his anus. As a result, Mays was subjected to a five and one-half hour ordeal in

a strip cell where he was handcuffed behind his back and made to wear a too short hospital gown, while the guards waited for him to defecate. Nothing was found by the guards. Mays also contended another search was done in front of other inmates at a separate facility, but the court did not mention or consider that search in its decision. *Mays*, 719 F.3d at 645-646.

Conversely, Henderson complains of a single brief search. Although there was a small amount of vomit on the floor to the left of the door, Henderson was able to avoid it and did not have any physical contact with the vomit while he was in the room. When Henderson mentioned the vomit, Beierman said "step around it gentlemen". Henderson offered no evidence that Beierman took him to the property room because there was vomit on the floor or because the room stunk from the vomit. On the contrary, the only evidence presented is that the property room was the room where searches routinely occurred.

Moreover, Beierman made no derogatory comments about or toward Henderson during the search. Although Beierman threatened to "spray" Henderson, Beierman did so in an attempt to get Henderson to participate in the search, not in a mocking or harassing manner during the search. Indeed, Henderson concedes that the statement was made before the search had begun, *i.e.*, before Henderson had removed his clothing. Thus, this statement cannot reasonably be said to have been made to inflict psychological pain or made to humiliate Henderson during the group strip search.

As a result, this case is more akin to the facts found in *Whitman v. Nesic*, 368 F.3d 931 (7th Cir. 2004), than in *Mays*. In *Whitman*, a prisoner brought suit complaining of the manner in which a correctional officer conducted a strip search. *Id*. at 932. Specifically, the prisoner complained that he was forced to disrobe and to manipulate his body so that correctional officials could visually inspect his body for drugs or other banned materials that could be used to

contaminate a urine sample. *Id*. at 933. The prisoner was then forced to stand naked in a shower stall for approximately twenty minutes until he could produce a urine sample to be tested for drugs. *Id*.

The random search was performed pursuant to a Wisconsin Department of Corrections random drug testing program. *Id*. After the prisoner was able to produce a urine sample, he was allowed to put his clothes back on and to return to his cell. *Id*. The officers never made any derogatory comments during the search to or about the prisoner. *Id*.

In affirming the district court's grant of summary judgment in *Whitman*, the Seventh Circuit held that the strip search was "plainly constitutional." *Id*. at 934. In reaching this conclusion, the Seventh Circuit noted that cogent reasons existed for the search and that the plaintiff's subjective feelings of humiliation did not rise to the level necessary to afford constitutional protections. *Id*. The Seventh Circuit went on to reiterate the limited expectation of privacy to which a prisoner is entitled and the lack of any evidence presented by Whitman to show that any of the defendants said or engaged in any action intended to harass or humiliate him during the search. *Id.*

The plaintiff in *Whitman*, as in this case, argued that the defendant's actions were inconsistent with and violated institutional rules and state law as the search was in violation of the Wisconsin Department of Corrections and the correctional institution's written procedures regarding random drug testing. The *Whitman Court* noted that the argument was immaterial regardless of the plaintiff's insistence that a defendant failed to follow state law. The Court stated that the mere fact that state rules or statutes are violated does not in and of itself amount to a constitutional violation or give rise to an action §1983 claim. The Court also noted that the federal government is not the enforcer of state laws. *Whitman*, 386 F.3d at 936, footnote 1.

As in *Whitman*, Henderson failed to offer any evidence that Beierman engaged in any speech, conduct, or action that was intended to harass or humiliate him during the search. The statements made by Beierman to Henderson prior to the search directed Henderson to avoid the vomit on the floor and instructed him to participate under the threat of being pepper sprayed. However, these statements were made before the strip search began and cannot reasonably be interpreted as designed to humiliate or demean Henderson as part of the search.

Third, Henderson has failed to offer any support for his argument that Beierman violated his constitutional rights by refusing to allow him to speak with a sergeant. The Court is not aware of any authority which indicates such statements constitute a constitutional violation, and it does not believe that refusing a prisoner's request to obtain a superior officer prior to a search of the prisoner constitutes a constitutional violation, especially in a situation such as this where the inmate or detainee has the right and ability to file a subsequent grievance, as he did in this case.

Henderson's true complaint appears to be that he was forced to disrobe and to manipulate his body in front of other prisoners or detainees. But as noted *supra*, the fact that Henderson was subjected to a strip search together with other inmates does not in and of itself violate the Constitution. *Meriwether v. Faulkner*, 821 F.2d at 418 (citing *Bell*, 441 U.S. at 537), *Headrick*, 2013 WL 6822103, * 2.

The search in *Headrick* was factually similar to the search at issue in this case. However, the district court in *Headrick* noted the presumption of special concerns of a prisoner transferring to a county jail from a state prison and the possibility that he may be bringing in a dangerous weapon or other contraband a penological justification to conduct group strip searches. *Id*. Like Headrick, Henderson was transferred from a state prison to the Jail, and no evidence exists to

show that the strip search conducted by Beierman on Henderson was performed in such a manner or in such a locale as to harass or humiliate Henderson.

In short, in order to violate the Constitution, the strip search must have been performed with the intent to humiliate, harass, or demean Henderson. *Mays*, 719 F.3d at 634. In balancing the relevant factors, the Court finds that no constitutional violation of Henderson's right occurred even assuming Henderson's version of the events are true because visual inspections of naked prisoners are not per se unconstitutional. *Bell*, 441 U.S. at 559. Moreover, a group search of naked prisoners is not per se unconstitutional. *Meriwether*, 821 F.2d at 418; *Headrick*, 2013 WL 6822103, * 2. The 8th Amendment's prohibition against cruel and unusual punishment stands as a "protection against bodily searches which are maliciously motivated, unrelated to institutional security, and hence, totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59; see *Hudson,* 468 U.S. at 530, 104 S.Ct. at 3202, *Smith v. Chrans*, 629 F. Supp. 606, 610-11 (C.D. Ill. 1986); *Roscom v. City of Chicago*, 570 F. Supp 1259 (N.D. Ill. 1983) (finding against plaintiff on facts similar to this case) .[4] The actions taken by Beierman in this case viewed in the light most favorable to Henderson do not violate 8th Amendment prohibitions. Because there is insufficient evidence that the conditions of the search were intended to harass or demean Henderson, Beierman is entitled to judgment as a matter of law whether Henderson's complains are viewed individually or as a whole**.**

Plaintiff has failed to provide evidence satisfying an objective inquiry as to whether violation of Henderson's 8th Amendment rights is "sufficiently serious" so that "a prison

---

[4] Henderson argues that *Roscom v. City of Chicago*, *supra* cited by the Defendant, is distinguishable and that his case needs to proceed to a jury trial because the evidence in this case (as opposed to that in *Roscom*) showed that the Jail violated its own policy against conducting group strip searches. Henderson contends that this fact could be relied upon by a jury to find that the search occurred and violated his constitutional rights. However, as noted above, the Seventh Circuit rejected a similar argument when granting summary judgment in *Whitman, supra.*

official's act or omission results in the denial of the minimal civilized measure of life's necessities" occurred in this case. (See *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Consequently, it is unnecessary to review the subjective state of mind of Defendant Beierman.

Because the Court finds that there are no 8th Amendment violations, it is not necessary to reach Beierman's argument regarding qualified immunity.

## IV.
## PLAINTIFF'S *MONELL* CLAIM AGAINST SANGAMON COUNTY

Plaintiff asserts in his complaint a claim against Defendant Sangamon County. Plaintiff has presented no evidence of an express policy or widespread practice which would pose liability on Sangamon County. Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-691 (1978), "municipalities cannot be held liable under §1983 under theory of *respondeat superior"*. Moreover, municipal liability for a constitutional injury requires a finding that an individual officer is liable on the underlying substantive claim. *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986); *Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000) (no municipal liability absent underlying constitutional violation). Consequently, as the Court finds no liability of Officer Beierman, there is no liability against Sangamon County. The Defendants' Motion for Summary Judgment regarding the *Monell* claim against Sangamon County is granted.

**IT IS, THEREFORE, ORDERED:**

**1. Defendants' Motion for Summary Judgment [90] is GRANTED as to all Defendants as stated above. The Clerk of the Court is directed to enter judgment in all Defendants' favor and against Plaintiff. All pending motions are denied as moot, and this case is terminated, with the Parties to bear their own costs. All deadlines and settings for final pretrial conference and trial on the Court's calendar are vacated.**

**2.     If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4).**

**3.     If Plaintiff wishes to proceed in forma pauperis on appeal, his motion for leave to appeal in forma pauperis must identify the issues that he will present on appeal to assist the Court in determining whether the appeal is taken in good faith.** *See* **Fed. R. App. P. 24(a)(1)(c);** *Celske v. Edwards*, **164 F.3d 396, 398 (7th Cir. 1999)(an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a responsible assessment of the issue of good faith.");** *Walker v. O'Brien*, **216 F.3d 626, 632 (7th Cir. 2000)(providing that a good faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff chooses to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.**

ENTERED:  November 24, 2014

                              *s/ Tom Schanzle-Haskins*
                              TOM SCHANZLE-HASKINS
                              UNITED STATES MAGISTRATE JUDGE